# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NIGEL ALI MAITLAND** | : | **Civil No. 3:16-cv-2044** |
| | : | |
| **Petitioner** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **ROBERT GILMORE, PA STATE** | : | |
| **ATTORNEY GENERAL,** | : | |
| | : | |
| **Respondents** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Petitioner Nigel Ali Maitland ("Petitioner" or "Maitland"), a state inmate currently confined at the State Correctional Institution at Huntingdon, Pennsylvania, files the instant petition (Doc. 1) for writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking relief from convictions of murder in the first degree, 18 PA.C.S. § 2502(a), criminal conspiracy, 18 PA.C.S. § 903, and a firearms violation 18 PA.C.S. § 6105, obtained in criminal case CP-67-CR-00003898-2009, in the Court of Common Pleas of York County, Pennsylvania. The petition is presently ripe for disposition.  For the reasons set forth below, the petition will be denied.

## I.    **Background**

The facts underlying Maitland's convictions are contained in the June 19, 2012 decision of the Superior Court of Pennsylvania affirming his Judgment of Sentence which

was entered in the Court of Common Pleas of York County on August 4, 2011. (Doc. 13-

1). The facts are as follows:

In the early hours of May 10, 2009, [Maitland], Skyler Handy ("Handy"), Bradley Walker, ("Walker"), and several other young men from the Parkway area of York City, were at Cheers Bar on East Market Street in East York. The bar was located in a "neutral zone," *i.e.,* not part of the Parkway area or the South Side area. A fight broke out at the bar, between members of the Parkway area and the South Side area over an incident that occurred a month earlier and involved [Maitland's] younger brother, Niam Johnson.

At trial, Fernando Valentin, Jr. ("Valentin"), who was originally charged with first-degree murder and criminal conspiracy along with [Maitland], testified for the Commonwealth in exchange for the Commonwealth's promise to drop all charges filed against him. Valentin testified that he arrived at the bar just prior to the fight. According to Valentin, someone pushed him to the floor while trying to get to [Maitland]. Bottles and stools were thrown during the bar fight and Walker was badly injured. As Valentin was getting up off the floor, he saw a group of young men rush toward him, [Maitland], and their companions. Valentin and [Maitland] fled the bar. [Maitland] left in a red Dodge Avenger. Valentin ran and called his cousin to pick him up down the street from the bar.

Valentin's cousin picked him up and took him to the Parkway area to meet up with [Maitland], Handy, and others. When Valentin arrived, he saw one of the young men from the Parkway area waving a gun and arguing with "Woody," who was from the South Side area, about the bar fight. Once Woody left the area, [Maitland], Handy, and some others came out of a house. Some of the young men got into a Ford Fusion, while others, including [Maitland], got into the Dodge Avenger. Although the two cars first stopped at the Holiday Inn on Route 30 in York, they proceeded to cross the street and rent a room at the Days Inn. At some point, Valentin went to get a soda. When he returned, only [Maitland] and Handy were in the room. At this time, Valentin observed an automatic handgun on the lower portion of a nightstand between the two beds, as well as a revolver in [Maitland's] shoe. [Maitland], Handy, and Valentin talked for a while, and then went to sleep. Sometime before noon, [Maitland] and Handy woke up Valentin, and the three checked out of the hotel.

[Maitland], Handy, and Valentin then drove in the Dodge Avenger to Lee's Store on Pershing Avenue in the Parkway area of York. At the store, the trio met others from the Parkway area and discussed the fight that occurred at Cheers. [Maitland] left at one point and returned to join the group. During that time, a silver Chevy Tahoe drove by the store. [Maitland] and Handy approached the Chevy Tahoe; shortly thereafter, the Tahoe left the area.

Around 2: 00 p. m., [Maitland], Handy, and Valentin entered the Dodge Avenger, with [Maitland] driving, Handy in the passenger seat, and Valentin in the back seat behind Handy. According to Valentin, they intended to finish smoking their marijuana and go to the mall to shop for Mother's Day presents. At some point, Valentin told [Maitland] to drop him at his sister's house, but [Maitland] drove in the opposite direction.

According to Valentin, the car was driving on Duke Street in an area of York that he knew "was outside of our territory." N. T., 3/ 8/ 11, at 511. Valentin then heard [Maitland] say, "Oh shit," and the car swerved and stopped. After ducking down in the back seat, Valentin looked up and saw Handy hanging out of the window of the vehicle with a semi-automatic gun in his hand. At that time, Valentin also heard the driver's side door open, followed by three to four shots being fired by [Maitland]. [Maitland] then got back into the car and the three fled the scene.

Valentin further testified that, as [Maitland] was driving away from the scene, Handy was trying to unjam the semi-automatic gun and inadvertently pointed it at [Maitland]. [Maitland] yelled at Handy and told him to give the gun to Valentin. According to Valentin, [Maitland] said that he hoped "none of them bitches got hit that was over there." N. T., 3/ 8/ 11, at 515. As [Maitland] proceeded to drive up South Duke Street, someone appeared in front of them and threw a brick or rock at the side of the car. The impact knocked the passenger side mirror off the vehicle.

[Maitland] continued to head north to a small parking lot where he parked the Dodge Avenger. After checking the damage to the vehicle, the trio left on foot and proceeded to Smith Street. Once there, Handy got into the driver's seat of a silver Chevy Tahoe. Valentin got into the passenger seat, and [Maitland] entered the back seat. Handy drove the vehicle to Lee's

Store, where the three told some young men standing in front of the store what had happened. According to Valentin, they told them "to be careful in case [some] Southside dudes try to come around." N. T., 3/8/11, at 520.

Handy then drove to the West Manchester Mall in York. Valentin testified that they were going to stop at the Bon Ton, but instead went into the movie theater and bought some tickets. After they bought the tickets, however, Handy began to get some phone calls about the shooting. The trio then left the theater without watching the movie. Handy then dropped Valentin off, and he and [Maitland] left in the Chevy Tahoe.

Mariah Johnson-Skibber testified that she was in front of 537 South Duke Street playing with the nine-year-old victim and some other children. According to Ms. Johnson-Skibber, a group of about fifteen to twenty males, ages thirteen to twenty, were hanging out on the same side of the street. Ms. Johnson-Skibber heard one of the young men scream, "Oh, shit," and she then saw a red car coming up the street swerving and stop about five houses up from where she and the kids were playing. Ms. Johnson-Skibber then observed [Maitland] get out of the driver's side of the vehicle with a gun and point it in her direction. According to Ms. Johnson-Skibber, after she heard the first shot, she picked up one of the kids and hid behind a porch. She testified that she heard three to four shots coming from the same gun. After Ms. Johnson-Skibber saw the car drive away, she came out from behind the porch and saw the victim laying on her stomach in a pool of blood and asking for help. The victim's uncle ran outside, put the victim in his car, and drove to the hospital. The victim died a short time later from a gunshot wound to her back.

The Commonwealth also introduced a letter [Maitland] had written while he was incarcerated. Within the letter, [Maitland] wrote:

I'm sitting here reading your letter, and the shit brought me to tears because this shit hurts, and I know you just as sick as me, cuz, and the crazy thing about it was I was on my fallback, but them bitch ass niggas was taking it too far. They crossed the line when they fucked with [my younger brother]. Them bitch niggas sent some young boys to rob him just to get my [cell phone] number, then called me off of [my brother's] phone saying they kidnapped him. They didn't, but that was the last fucking straw. I was letting mad little shit slide, but I couldn't let that

4

rock. I just wish that lil girl didn't get hurt by a stray. That shit hurts on the inside because it wasn't intended for her.

Now I got this case to deal wit [sic], and on top of that, both of my [co-defendants] are telling. So, like I said, I just turn to God, but I keep my mouth shut, and you already know I'm on my shit. Win, lose, or draw, imma [sic] fucking rumble. I never been a bitch, and I'm damn sure not going to start now. N. T., 3/ 9/ 11, at 629- 30.

[Maitland] also testified at trial. [Maitland] explained that he was driving in the South Duke Street area when he saw a black male emerge from the side of the street and reach for a gun under his shirt. According to [Maitland], he then swerved and stopped the car, and shot at the male in an effort to defend himself.

On March 10, 2011, a jury convicted [Maitland] on all three charges. On April 7, 2011, the trial court sentenced [Maitland] to life imprisonment for the first-degree murder conviction, a consecutive term of twenty to forty years of imprisonment for the criminal conspiracy conviction, and a consecutive term of five to ten years for the firearm violation.

(Doc. 13-1, pp. 1-6).

Maitland filed a direct appeal raising the following issues:

I. Whether the trial court erred in concluding the Commonwealth presented sufficient evidence to sustain guilty verdicts on the criminal offenses of Murder in the First Degree and Criminal Conspiracy to Commit Criminal Homicide?

II. Whether the trial court erred in denying [Maitland's] motion for judgment of acquittal on the basis that the weight of the evidence presented at trial showed that he did not possess a specific intent to kill?

III. Whether the trial court erred in denying [Maitland's] motion for change of venue/ venire when the highly scrutinized media coverage the case received prevented him from empanelling a fair and impartial jury from York County?

(Id. at 7).  The Superior Court affirmed the Judgment of Sentence on June 19, 2012.  (Id. at 23).

Maitland pursued his direct appeal in the Pennsylvania Supreme Court; the court affirmed on April 26, 2013.  (Doc. 13-8, p. 2).  Thereafter, he petitioned the United States Supreme Court for Writ of Certiorari, which the Supreme Court denied on November 14, 2013.  (Id.)

On February 26, 2014, Maitland filed a petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 PA.C.S.A. §§ 9541-9546.  He raised a  number of claims which the PCRA addressed in two separate opinions.  In the first opinion, the court rejected the ineffective assistance of counsel claims concerning counsel's failure to object to the statements made by the prosecution during closing argument which indicated that Maitland was in a gang, contrary to the testimony of the expert witness who only testified that Maitland could be in a gang; counsel's failure to strike Juror No. 48 for cause; and, counsel's failure to view a surveillance video with Maitland.  (Doc. 13-7, pp. 1-5). The court also rejected his claim that the trial court erred with regard to a curative instruction. (Id.).  In its second opinion, the court rejected Maitland's claim that counsel was ineffective in failing to use impeachment evidence against witnesses Johnson and Valentin.[1]  (Doc. 13-8, p. 2; Doc. 1, pp. 34, 35).

---

[1] There are different spellings of the name of witness Fernando Valentin.  During the trial and in most of the state court opinions, he is referred to as Valentin.  (Doc.13-1, p. 2; Doc. 13-2, p. 3Doc. 13-10, p. 3).  The PCRA court and Maitland refers to him as Valentine. (Doc. 13-7, p. 3; Doc. 1, p. 20).  The Court will assume that "Valentin," the spelling the witness provided during his trial testimony is the correct spelling.

Maitland pursued an appeal, raising the following issues:

1. Whether the [PCRA] court committed an error of law when it denied relief pursuant to the [PCRA] on the basis that trial counsel was ineffective for failing to timely object to the prosecutor's references in closing argument to [Maitland's] gang affiliation?

2. Whether the [PCRA] court committed an error of law when it denied relief pursuant to the [ PCRA] on the basis that the trial court's curative instruction regarding [Maitland's] gang affiliation and the prosecutor's closing argument was insufficient to prevent prejudice?

3. Whether the [PCRA] court committed an error of law when it denied relief pursuant to the [PCRA] on the basis that trial counsel was ineffective for failing to strike Juror Number [Forty-eight] who felt sorry for the victim and was unsure of whether she could be fair and impartial?

4. Whether the [PCRA] court committed an error of law when it denied relief pursuant to the [PCRA] on the basis that [d]efense counsel was ineffective for withdrawing a Rule 600 motion which had arguable merit and [Maitland] was not in agreement?

(Doc. 13-4, pp. 2, 3, citing Maitland's Brief).

On September 28, 2015, in affirming the denial of PCRA relief, the Superior Court addressed the first and fourth claims on the merits, but deemed the second and third issues waived. (Id. at pp. 4-8). Maitland filed a petition for allowance of appeal with the Supreme Court, which the court denied on February 1, 2016. (Doc. 13-13).

Maitland filed the instant petition on October 11, 2016.

## II.     Issues Presented for Federal Review

Maitland presents the following issues for our review:

1.     Ineffective assistance of trial counsel in failing to preserve and prepare to litigate his right to a speedy trial.

7

2.      Ineffective assistance of trial counsel in failing to strike a biased juror.

3.      Ineffective assistance of trial counsel in failing to object to the prosecutor's gang references during closing argument.

4.      Trial court error with regard to a curative instruction.

5.      Ineffective assistance of PCRA counsel.

6.      Ineffective assistance of trial counsel in ignoring impeachment evidence of two Commonwealth witnesses.

7.      Ineffective assistance of trial counsel with regard to surveillance video presented at trial.

8.      Ineffective assistance of trial counsel in failing to investigate and prepare to litigate the critical issues of ballistic evidence including his failure to secure independent ballistic expert, forensic pathologist expert and or to seek D.N.A. testing on any available evidence.

(Doc. 1, pp. 5, 6, 8, 9, 15, 20, 25, 30).

## III.   <u>Discussion</u>

A habeas corpus petition pursuant to 28 U.S.C. § 2254 is the proper mechanism

for a prisoner to challenge the "fact or duration" of his confinement.  <u>Preiser v.

Rodriguez</u>, 411 U.S. 475, 498-99 (1973).  Maitland's case is governed by the

Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat.

1214, April 24, 1996 ("AEDPA").  28 U.S.C. § 2254, provides, in pertinent part:

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

(b)(1) an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –

    (A)  the applicant has exhausted the remedies available in the courts of the State;

    ...

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

    (1)  resulted in a decision that was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254.  Section 2254 clearly sets limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner.  Cullen v. Pinholster, 536 U.S. 170, 181 (2011); Glenn v. Wynder, 743 F.3d 402, 406 (3d Cir. 2014).  A federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  "[F]ederal habeas corpus relief does not lie for errors of state law."  Lewis v. Jeffers, 497 U.S. 764, 780 (1990); see also Pulley v. Harris, 465 U.S. 37, 41 (1984).  By limiting habeas relief to state conduct which violates "the Constitution or laws or treaties of the United States," § 2254 places a high threshold on the courts.  Additionally, relief cannot be granted unless all available state remedies have

been exhausted, or there is an absence of available state corrective process, or circumstances exist that render such process ineffective to protect the rights of the applicant.  See 28 U.S.C. § 2254(b)(1).

## A.  Exhaustion and Procedural Default

Habeas relief "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State," meaning a state prisoner must "fairly present" his claims in "one complete round of the state's established appellate review process," before bringing them in federal court.  28 U.S.C. § 2254(b)(1)(A); see also O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (stating "[b]ecause the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, . . .  state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established review process."); see also Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 275 (1971); Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997).  The exhaustion requirement is grounded on principles of comity in order to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions.  See Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000).

A petitioner has exhausted a federal claim only if he or she presented the "substantial equivalent" of the claim to the state court.  Picard, 404 U.S. at 278.  To satisfy this requirement, a petitioner must "fairly present" his federal claim's "factual and

10

legal substance to the state courts in a manner that puts them on notice that a federal

claim is being asserted." Robinson v. Beard, 762 F.3d 316, 328 (3d Cir. 2014); see

Baldwin v. Reese, 541 U.S. 27, 29 (2004); see McCandless v. Vaughn, 172 F.3d 255, 261

(3d Cir. 1999).

　　　　1.　　Ground 2

Ground 2 contains a claim that trial counsel was ineffective for failing to strike

Juror #48 based on bias.  Maitland raised the issue during his initial PCRA proceedings

and pursued it on appeal.  The Superior Court disposed of the issue as follows:

> Maitland also argues that Attorney Spadafora and co-counsel, Autumn
> Walden, Esquire, were ineffective for failing to strike a particular juror, Juror
> Number Forty-eight, for cause because she stated that she had read about the
> crime and felt sad for the family of the victim. Maitland's Brief at 17.
> Maitland does not cite, much less discuss, even one authority in support of
> his position. *See id*, at 17- 20. The Rules of Appellate Procedure require that
> appellants adequately develop each issue raised with discussion of pertinent
> facts and pertinent authority.  *See* Pa. R. A. P. 2119(a). It is not this Court's
> responsibility to comb through the record seeking the factual underpinnings
> of an appellant's claim. *Commonwealth v, Mulholland*, 702 A. 2d 1027, 1034
> n. 5 (Pa. 1997). Further, this Court will not become the counsel for an
> appellant and develop arguments on an appellant's behalf.  *Commonwealth
> v, Gould*, 912 A. 2d 869, 873 ( Pa. Super. 2006).  It was Maitland's
> responsibility to provide an adequately developed argument providing
> citation to and discussion of relevant authority. Because he has failed to do
> so, we find this issue waived.

(Doc. 13-4, pp. 5, 6).

　　　"[A] state prisoner's habeas claims may not be entertained by a federal court

"when (1) 'a state court has declined to address those claims because the prisoner had

failed to meet a state procedural requirement,' and (2) 'the state judgment rests on

independent and adequate state procedural grounds.' " Walker v. Martin, 562 U.S. [307, 316] (2011) (quoting Coleman, 501 U.S. at 729-30)." Maples v. Thomas, 565 U.S. 266, 280 (2012). A decision based on a state procedural rule is considered independent if it does not rely on the merits of the federal claim or rest primarily on federal grounds. Harris v. Reed, 489 U.S. 255, 260 (1989); see also Ake v. Oklahoma, 470 U.S. 68, 75 (1985). A state rule is "adequate" for procedural default purposes if it was "firmly established, readily ascertainable, and regularly followed at the time of the purported default." Szuchon v. Lehman, 273 F.3d 299, 327 (3d Cir. 2001). "[A] state procedural ground is not 'adequate' unless the procedural rule is 'strictly or regularly followed,' " Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and the rule "speaks in unmistakable terms." Doctor v. Walters, 96 F.3d 675, 683 (3d Cir. 1996) (abrogated on other grounds, Beard v. Kindler, 558 U.S. 53 (2009)). These requirements ensure that "federal review is not barred unless a habeas petitioner had fair notice of the need to follow the state procedural rule," and that review is foreclosed by "what may honestly be called 'rules' ... of general applicability[,] rather than by whim or prejudice against a claim or claimant." Leyva v. Williams, 504 F.3d 357, 366 (3d Cir. 2007) (quoting Bronshtein v. Horn, 404 F.3d 700, 707 (3d Cir. 2005)).

Pennsylvania Rule of Appellate Procedure 2119(a) requires that each argument presented on appeal be "followed by such discussion and citation of authorities as are deemed pertinent." PA. R. A. P. 2119(a). A failure to cite legal authorities or to develop

argument results in waiver. See, e.g., Williams v. Patrick, No. 07-776, 2014 WL 2452049, at *7 (E.D. Pa. June 2, 2014) (explaining a "doctrine of waiver" has been long incorporated into Rule 2119(a) (overruled on other grounds); Commonwealth v. Love, 896 A.2d 1276, 1287 (Pa. Super. 2006) (citing Commonwealth v. Burkett, 830 A.2d 1034, 1038 (Pa. Super. 2003) and Commonwealth v. Miller, 721 A.2d 1121, 1124 (Pa. Super. 1998) ) (stating "Of particular importance is the provision of Rule 2119(a) that a brief must contain a developed argument augmented by citation to pertinent authorities. Arguments not appropriately developed are waived."). Federal courts in this circuit have found this "waiver rule" to be an independent and adequate state court ground precluding federal review. See Rodriguez v. Giroux, No. CV 15-6182, 2017 WL 10821396, at *17 (E.D. Pa. Feb. 17, 2017), report and recommendation adopted, No. CV 15-6182, 2019 WL 587314 (E.D. Pa. Feb. 12, 2019) (collecting cases). There is no dispute that the waiver rule was firmly established, readily ascertainable, and regularly followed at the time of the default. It is evident from the above that Maitland's claim that trial counsel was ineffective for failing to strike Juror #48 based on bias was not fairly presented to the state courts. "When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, as is the case here, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.' 28 U.S.C. § 2254(b). In such cases, however, applicants are considered to have procedurally defaulted their claims and

federal courts may not consider the merits of such claims unless the applicant establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse his or her default.  See Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)."  McCandless, 172 F.3d at 260.

To demonstrate "cause" for a procedural default, a petitioner must point to some objective external factor which impeded his efforts to comply with the state's procedural rule.  See Murray v. Carrier, 477 U.S. 478, 488 (1986).  "Prejudice" will be satisfied only if he can demonstrate that the outcome of the state proceeding was "unreliable or fundamentally unfair" as a result of a violation of federal law.  See Lockhart v. Fretwell, 506 U.S. 364, 366 (1993).

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent," Murray, 477 U.S. at 496, then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Wenger v. Frank, 266 F.3d 218, 224 (3d Cir. 2001).  The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency.  Bousley v. United States, 523 U.S. 614, 623 (1998); Murray, 477 U.S. at 496.  A petitioner establishes actual innocence by asserting "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," showing that no

reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. Hubbard v. Pinchak, 378 F.3d 333, 339-40 (3d Cir. 2004).

Maitland fails to identify some objective external factor which prevented him from complying with the state's procedural rules and he does not demonstrate that the outcome of the state proceeding was "unreliable or fundamentally unfair" as a result of a violation of federal law. Nor is there any argument or indication that a "constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496. Ground 2 is therefore procedurally defaulted and federal review is barred.

      2.    <u>Ground 4</u>

In Ground 4, Maitland contends that the trial court violated his due process rights when iy failed to provide the jury with an adequate curative instruction to remedy the gang affiliation remarks made by the prosecutor during closing arguments. He raised the issue during his PCRA proceedings. In considering the claim on appeal, the Superior Court held as follows: "Maitland's final claim alleges an error on the part of the trial court; specifically, that a curative instruction the trial court gave to the jury was inadequate. Maitland's Brief at 14. A prerequisite for relief under the PCRA is that the claim the petition seeks to raise is not previously litigated or waived. 42 PA. C. S. A. § 9543( a)( 3). A claim is waived for purposes of PCRA review if the petitioner could have raised it on direct appeal but did not. Commonwealth v, Rivera, 108 A. 3d 779, 802 (Pa. 2014). Maitland could have raised this claim of trial court error on direct appeal, but he

did not. Accordingly, he has waived it and cannot raise it under the PCRA." (Doc. 13-4, pp. 7, 8).

The rule relied on by the state court, 42 PA. C. S. A. § 9453(a)(3) requires a petitioner seeking PCRA relief to plead and prove that the issue he or she raises has not been waived. Also, 42 Pa. C. S. A. § 9544(b) states that "an issue is waived if the petitioner could have raised it but failed to do so ... on appeal or in a prior state postconviction proceeding." Because the state court determined that Maitland waived this issue in failing to meet a state procedural requirement, a finding which rests on an independent and adequate state law ground, the claim is procedurally defaulted.

Mailtand failed to fairly presented this issue to the state courts and, as such, it is unexhausted and procedurally defaulted. He fails to identify some objective external factor which prevented him from complying with the state's procedural rules and he does not demonstrate that the outcome of the state proceeding was "unreliable or fundamentally unfair" as a result of a violation of federal law. And there is no argument or indication that a "constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496. Ground 4 is therefore procedurally defaulted and federal review is barred.

   3. Ground 6

In Ground 6, Mailtand alleges that trial counsel ignored evidence relevant to the impeachment of witnesses Valentin and Johnson. (Doc. 1, p. 20). He raised the issue in

his initial PCRA proceedings and the PCRA court adjudicated the claim on the merits. (Doc. 13-8, pp. 34, 35). However, he failed to pursue the claim in his PCRA appeal. Maitland concedes that this claim is unexhausted and procedurally defaulted. (Doc. 1, p. 21).

In his Traverse, he indicates that he is relying on the Martinez v. Ryan, 566 U.S. 1 (2010) exception to excuse the procedural default of his claim. (Doc. 19, p. 13) Martinez recognized a "narrow exception" to the general rule that attorney errors in collateral proceedings do not establish cause to excuse a procedural default. Specifically, Martinez holds that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9. To successfully invoke the Martinez exception, a petitioner must satisfy two factors: that the underlying, otherwise defaulted, claim of ineffective assistance of trial counsel is "substantial," meaning that it has "some merit," id. at 14; and that petitioner had "no counsel" or "ineffective" counsel during the initial phase of the state collateral review proceeding. Id. at 17, 132 S.Ct. 1309; see also Glenn v. Wynder, 743 F.3d 402, 410 (3d Cir. 2014).

A petitioner demonstrates the underlying ineffective assistance of trial counsel claim has "some" merit by "show[ing] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."

Workman, 915 F.3d at 937-38; see also Martinez, 566 U.S. at 13-14.  A petitioner demonstrates that post-conviction counsel's ineffectiveness caused the procedural default by showing that post-conviction counsel's performance was deficient under the first prong of the Strickland v. Washington, 466 U.S. 668 (1984) standard.  See Preston v. Sup't Graterford, SCI, 902 F.3d 365, 376 (3d Cir. 2018); see also Workman v. Superintendent Albion SCI, 915 F.3d 928, 937–38 (3d Cir. 2019).  Satisfaction of the first Strickland prong requires a petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance.  Strickland, 466 U.S. at 688.

He first argues that that the procedural default should be excused based on PCRA counsel's failure to include the claim in the appeal to the Superior Court.  However, because Martinez applies only to defaulted claims of ineffective assistance of trial counsel, Maitland's argument that exhaustion should be excused because PCRA counsel failed to pursue the claim beyond the initial collateral proceedings fails.  See Davila v. Davis, ⸻ U.S. ⸻, 137 S.Ct. 2058, 2065 (2017) (declining to extend Martinez to defaulted claims of ineffective assistance of appellate counsel); Murray v. Diguglielmo, No. 09-4960, 2016 WL 3476255, at *4 (E.D. Pa. June 27, 2016) ("These claims do not involve ineffective assistance of [trial] counsel.  Martinez does not apply.").

Maitland also argues that the procedural default should be excused based on PCRA counsel's failure to submit additional evidence relevant to the impeachment of witnesses Valentin and Johnson to the PCRA court following the hearing.

Trial counsel testified at the PCRA hearing as follows:

Q. And do you recall what your strategy was in regards to cross-examining [Valentin]?

A. Yeah, mainly -- if you first look at his direct testimony, there wasn't a lot of – what's the word I'm looking for? There wasn't a lot of hurtful testimony on his direct.

You know, our whole defense here all along was that my client did shoot and it was in self- defense and my client was extremely remorseful when someone got hit when he was just trying to defend his own life and get out of there.

So based on the testimony that was given on direct, it really kind of added up to what -- to the argument we were making. So, you know, when you do that and you want to try to cross- examine, you want to make sure you don't ask too many questions because you could open up something that you don't want to open up on redirect or have them say something you don't want them to say based off his direct, and we did some cross- examining, and we got out of him what we needed.

Q. And do you recall the testimony of an individual named Mariah Johnson-Skibber?

A. I actually remember her. I can't remember -- I remember -- I don't remember the exact testimony 100 percent. You have to ask me more specific questions.

Q. Do you remember her testifying specifically on page 234 during your cross examination that the person, that the shooter wore a white T- shirt and dark jeans, and a fitted hat?

A. I do remember her. That's fine, yes.

Q. And how did that affect your strategy for this case?

A. I'm trying to think back. I know there was an issue with the color of the shirt that he did have on. Without having that testimony in front of me, the transcripts in front of me to review that, which obviously I don't, I don't remember her testimony and how we addressed that specifically enough to answer that question intelligently. I would have to refer to the transcript.

Q. Now, referring to your closing argument, specifically pages 753 and 754, is it fair to say that you used the fact that Ms. Skibber identified the shooter in a white T-shirt, fitted jeans, and a hat as being –

A. Is that what you're asking me?

Q. -- Skyler Handy?

A. I recall that. I mean, I'm not sure what you're asking me.

Q. Did you use her testimony regarding what the shooter was wearing to benefit or to the detriment of Mr. Maitland?

A. Obviously, it was the benefit.

Q. And did you feel any need to impeach her testimony regarding what the shooter was wearing?

A. No.

(Doc. 13-6, pp. 13-15).

On cross examination, counsel further testified to the following:

Q. Let me just ask you this: Do you recall that [Valentin] gave more than one statement to the police?

A. Off the top of my head, what they exactly were that would have helped or hurt my client, no. As with any Defendant, are they more one time they're going to help the cops and then they get scared and then they back off and help themselves and they're constantly back and forth? Yeah, if there's

> something that was a huge red flag that I knew I should have brought in and
> I didn't. The testimony on direct was actually helpful to my client. You have
> to be very careful how much you want to ask when you already got helpful
> stuff that isn't hurting your case so he doesn't slip up and say something. It's
> a balance. You got to be careful. It's not like, you know, we didn't have a
> chance to speak with him personally. Obviously, he's represented. So we had
> to go with what we had. It's almost like gambling at Vegas. You got to know
> kind of when to put enough in and when to get out.

(Id. at 21, 22). Following the hearing, the PCRA court reserved decision on this issue.

Specifically, in its July 16, 2014, decision, the court stated that "[w]ith regard to issue

four, counsel never used impeachment evidence against two witnesses, we will grant

counsel for the Defendant time to review the discovery and submit as exhibits any

discovery that counsel believes might have impacted the testimony of the two witnesses,

Mariah and Valentin[], who testified, and we will further permit within that time period

any additional or supplemental argument to be submitted by counsel, if counsel desires to

do that. We will give counsel until close of business Friday, August 8th. In the meantime,

the Court will, in light of the arguments raised by Mr. Maitland, today once again review

the testimony of those two witnesses." (Doc. 13-7, pp. 3, 4).

In its November 3, 2014 decision, after noting that "[c]ounsel has informed us that

she has chosen not to submit any additional information," the court opined that "[w]e

have reviewed the testimony of the witnesses in question in light of the arguments made

by Mr. Maitland. In view of the fact that Mr. Maitland has not provided any material that

he believes would be suitable for impeachment of these witnesses, we cannot conclude

that trial counsel was ineffective for failing to confront the witnesses with such material.

Our review of the witnesses discloses no shortcomings by trial counsel. Accordingly, we deny Mr. Maitland's request for post-conviction relief." (Doc. 1, p. 34).

Maitland argues that PCRA counsel's failure to submit to the PCRA court impeachment evidence constituted deficient performance. He identifies the impeachment evidence as "Vaelntin's five inconsistent statements leading up to trial," Valentin's failed polygraph test, and Johnson's incorrect description of his clothing and inconsistent statements made to police detectives. (Doc. 1, p. 20). However, he fails to submit any of this evidence. Our inability to review the impeachment evidence prevents us from concluding that PCRA counsel's failure to submit the evidence constituted deficient performance for purposes of <u>Martinez</u>. It also places us in the identical position as the PCRA court with regard to review of the merits of the underlying claim. As such, we echo the PCRA court's conclusion that the claim lacks merit. Because Maitland has not provided any material that he believes would be suitable for impeachment of these witnesses, we cannot conclude that the underlying claim, that trial counsel was ineffective for failing to confront the witnesses with such material, has some merit. Maitland has failed to meet his burden under <u>Martinez</u> such that he can excuse his procedural default. Consequently, federal review of this claim is barred.

4.    <u>Ground 7</u>

In Ground 7, Maitland alleges he was "denied his right to due process and to effective assistance of counsel under the Sixth and Fourteenth Amendments…when trial

22

counsel stipulated to the video recording/footage at trial without a proper investigation before trial of video recording." (Doc. 1, p. 25). He concedes that the claim is procedurally defaulted and again relies on <u>Martinez</u> to excuse the procedural default. Specifically, he seeks to excuse the default because "Apellant [sic] counsel for petitioner chose not to raise this issue in her apellant [sic] brief to superior court without Petitioner's consent." (Doc. 1, p. 26; Doc. 19, p. 13).

Because <u>Martinez</u> applies only to defaulted claims of ineffective assistance of trial counsel, Maitland's argument that exhaustion should be excused because PCRA counsel failed to pursue the ineffective assistance of trial counsel claim beyond the initial collateral proceedings fails. <u>See</u> <u>Davila v. Davis</u>, —— U.S. ——, 137 S.Ct. 2058, 2065 (2017) (declining to extend <u>Martinez</u> to defaulted claims of ineffective assistance of appellate counsel). Additionally, to the extent he attempts to raise a due process claim, he cannot rely on <u>Martinez</u> to excuse a procedural default as the exception only apples to ineffective assistance of trial counsel claims. <u>Murray v. Diguglielmo</u>, No. 09-4960, 2016 WL 3476255, at *4 (E.D. Pa. June 27, 2016) ("These claims do not involve ineffective assistance of [trial] counsel. <u>Martinez</u> does not apply."). Review of this claim is barred.

     5.    <u>Ground 8</u>

In Ground 8, Maitland contends that trial counsel was ineffective for failing "to investigate and prepare to litigate critical issues of ballistic evidence including his failure to secure independent ballistic expert, forensic pathologist expert and or to seek any

D.N.A. testing on any available evidence." (Doc. 1, p. 30). Maitland did not present this claim in the state courts and it is now procedurally defaulted. He concedes that the claim is procedurally defaulted but, in an effort to excuse the default, relies on Martinez. Specifically, he argues that "PCRA counsel was also ineffective for not raising this record based meritorious issue/claim of trial counsel's ineffective assistance." (Id. at 31).

> Maitland's "supporting facts" are as follows:
>
> Petitioner avers trial counsel rendered ineffective assistance due to his failure to properly prepare to litigate and challenge all ballistic evidence due to the Commonwealth's theory that petitioner fired fatal shot and due to it being more than one firearm involved. Trial counsel's dependency upon the prosecution's files is per-se ineffective of counsel. Counsel's duty is to seek and understand any and all evidence. Such a duty necessarily involves an independent investigation of the physical evidence and the employment of necessary expert witness. Trial counsel's reliance on the prosecution's files is not substitution for an independent investigation by defense counsel.

(Doc. 1, p. 30). These "facts" are wholly conclusory, lack specificity, are devoid of citation to the record, and without any supporting evidence. We therefore conclude that the underlying claim lacks some merit. And, as such, PCRA counsel's failure to raise the claim in the PCRA proceedings cannot be considered deficient performance. Because Maitland fails to satisfy the Martinez requirements, he is unable to excuse the procedural default of this claim.

**B.      Non-Cognizable Claim**

 1. Ground Five

In Ground five, Maitland contends that PCRA counsel was ineffective for failing to include in his PCRA appeal to the Superior Court the issue of trial counsel's ineffectiveness in failing to use impeachment evidence against two Commonwealth witnesses. (Doc. 1, pp. 15-19). Freestanding claims of ineffective assistance of PCRA counsel are not cognizable on federal habeas review. 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); see also Coleman v. Thompson, 501 U.S. 722, 752–53 (1991); Pennsylvania v. Finley, 481 U.S. 551, 555–56 (1987). Accordingly, this claim is non-cognizable.

**C.      Constitutional Claims Adjudicated on the Merits by the State Courts**

Remaining for consideration are the ineffective assistance of trial counsel claims set forth in Grounds 1 and 3. The state courts adjudicated each of these claims on the merits. As set forth *supra*, under the AEDPA, federal courts reviewing a state prisoner's application for a writ of habeas corpus may not grant relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"[B]ecause the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction," Greene v. Fisher, 565 U.S. 34, 38 (2011) (internal quotations and citations omitted), "[t]his is a difficult to meet and highly deferential standard . . . which demands that state-court decisions be given the benefit of the doubt." Cullen, 563 U.S. at 181(internal quotation marks and citation omitted). The burden is on Maitland to prove entitlement to the writ. Id.

A decision is "contrary to" federal law if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). "[A] state court decision reflects an 'unreasonable application of such law' only 'where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents,' a standard the Supreme Court has advised is 'difficult to meet' because it was 'meant to be.' [Harrison v.] Richter, 562 U.S. 86, [ ] 102, 131 S.Ct. 770. As the Supreme Court has cautioned, an 'unreasonable application of federal law is

different from an incorrect application of federal law,' Richter, 562 U.S. at 101, 131 S.Ct. 770 (quoting Williams, 529 U.S. at 410, 120 S.Ct. 1495), and whether we 'conclude[ ] in [our] independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly' is irrelevant, as AEDPA sets a higher bar. Williams, 529 U.S. at 411, 120 S.Ct. 1495." Mathias, 876 F.3d at 476. A decision is based on an "unreasonable determination of the facts" if the state court's factual findings are objectively unreasonable in light of the evidence presented to the state court. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

Finally, Section 2254(e) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The Superior Court applied the following standard of review to its analysis of Maitland's ineffective assistance of trial counsel claims:

> To prove ineffective assistance of counsel, an appellant must show ( 1) that the underlying claim is of arguable merit; (2) that counsel had no reasonable basis designed to effectuate the appellant's interests for the act or omission in question; and 3) that counsel's ineffectiveness actually prejudiced the appellant. Commonwealth v, Moser, 921 A. 2d 526, 531 ( Pa. Super. 2007). The failure to meet any prong of this test requires that the claim be dismissed. Id.

(Doc. 13-4, p. 4).

The clearly established Federal law governing ineffective assistance of counsel claims, as determined by the Supreme Court of the United States is as follows:

> Ineffective assistance of counsel claims are "governed by the familiar two-prong test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." <u>Shelton v. Carroll</u>, 464 F.3d 423, 438 (3d Cir. 2006) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). For AEDPA purposes, the <u>Strickland</u> test qualifies as "clearly established Federal law, as determined by the Supreme Court." <u>Williams</u>, 529 U.S. at 391, 120 S.Ct. 1495. Under <u>Strickland</u>, a habeas petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's error, the result would have been different. 466 U.S. at 687, 104 S.Ct. 2052. For the deficient performance prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." <u>Id.</u> at 688, 104 S.Ct. 2052. This review is deferential:

> > A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance....

> <u>Id.</u> at 689, 104 S.Ct. 2052

> Not every "error by counsel, even if professionally unreasonable, ... warrant[s] setting aside the judgment of a criminal proceeding." <u>Id.</u> at 691, 104 S.Ct. 2052. "Even if a defendant shows that particular errors of counsel were unreasonable, ... the defendant must show that they actually had an adverse effect on the defense"; in other words, the habeas petitioner must show that he was prejudiced by counsel's

deficient performance. <u>Id.</u> at 693, 104 S.Ct. 2052. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694, 104 S.Ct. 2052.

In assessing an ineffective assistance of counsel claim, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding.... In every case the court should be concerned with whether ... the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." <u>Id.</u> at 696, 104 S.Ct. 2052.

<u>Rainey v. Varner</u>, 603 F.3d 189, 197–98 (3d Cir. 2010). The Third Circuit has specifically held that the ineffectiveness assistance of counsel test relied upon by the Superior Court in this matter is not contrary to the Supreme Court's <u>Strickland</u> standard. <u>See</u> <u>Werts v. Vaughn</u>, 228 F.3d 178, 204 (3d Cir. 2000). Maitland does not argue otherwise.

When the state court has decided the claim on the merits, "[t]he question 'is not whether a federal court believes the state court's determination' under the <u>Strickland</u> standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.' " <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quoting <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007)). "And, because the <u>Strickland</u> standard is a general standard, a state court has even

more latitude to reasonably determine that a defendant has not satisfied that standard." Id.

1. Ground 1

Maitland alleges that trial counsel's failure to preserve and prepare to litigate his right to a speedy trial constituted ineffective assistance of counsel. He states that "both trial counsel [Attorney Blocher and Attorney Spadafora] withdrew [his] 600(e) motion/speedy trial in violation of [his] constitutional rights to a fair trial and to due process due to the lack of due diligence in bringing [him] to trial within the constitutional time frame aloted [sic] under the Pennsylvania Constitution and the corresponding federal constitution." (Doc. 1, p. 5). He contends that "[h]ad trial counsel proceeded forth in pretrial motions/hearing on this meritorious issue the outcome of these proceedings would have been different." (Id.). The issue was raised and fully adjudicated during the Maitland's PCRA proceedings.

At the PCRA hearing, Maitland testified to the following during his direct examination:

> A. My issue with the Rule 600 motion would be that my Counsel was ineffective for waiving Rule 600 in exchange for to drop the death penalty and schedule it for a Bench Trial, being that the Rule 600 outweighs any death penalty or anything, because the only cure for it is to discharge the indictment. That's why I guess there was a misconsumption (sic) of the law. That's why I'm raising ineffectiveness on him because he forced me. Basically he was coming to see me saying, "Look, man, you're on trial for murder, they're not going to grant you Rule 600. Your best bet is to get the

Commonwealth to drop the death penalty and do a Bench Trial." Me not knowing nothing, I agreed to do it, but now that I read the law and can see the case law for it, that it was a misconsumption (sic) of the law, my Counsel should have fought to argue Rule 600, which was in my best interests because it was a violation of my 14th Amendment.

Q. Okay. And so you're saying it wasn't your -- you weren't informed enough to make a decision at that time about what you wanted to do?

A. I'm saying that my lawyer scared me into doing it, because I didn't know anything. All I knew was that the Commonwealth was wrong for not taking me to trial in 365 days . I didn't know that in detail, the case law, and like the federal case law out on a speedy trial issue, but my lawyer was saying I wasn't going to get it anyway because I was on trial for murder, and they're not going to give somebody on trial for murder, they just not going to let you go, so your best bet is to waive your Rule 600 right, the Commonwealth will drop the death penalty, and you'll proceed, you'll waive your right to a Jury Trial and proceed to a Bench Trial. That's why I'm raising ineffective assistance of Counsel, because like I said, that's a misconsumption (sic) of the law, that Rule 600 outweighs that.

Q. When you hired Attorney Spadafora, did you discuss that issue and the Rule 600 motion with him?

A. He -- he -- Attorney Spadafora didn't follow suit. He just waived the motion. He told me, though, he said eventually you'll probably be able to bring it up, but he said for right now, just waive it. That's what he said.

Q. Waive it, meaning what, don't re-raise it?

A. Don't go -- have a hearing for it. Basically just leave it waived.

Q. Okay. So it was something you discussed with Attorney Spadafora?

A. Yes.

Q. And he never refiled the Rule 600 motions?

A. No.

Q. Did you tell him that's what you wanted him to do?

A. I wanted to do it from when I had Bruce Blocher, and then when I had Vincent Spadafora we went to the actual hearing, because when I had Bruce

Blocher, he waived it on record, but it wasn't a colloquy given. He just said yeah. You know, Your Honor, I didn't even speak at this hearing. He did all the talking. It's in the transcript. I didn't say one word at the hearing. He did all the talking. "Yeah, Your Honor, that's what my client's going to do," you know, this, that, and the third, and then waived it orally, but the Judge wanted a specific colloquy of me waiving it. And then by then I had Vincent Spadafora, and when I got colloquied, he just waived it, too.

Q. The hearing you're referring to where you didn't say anything, was that on August 9, 2010?

A. Yes .

Q. Okay.

     ATTORNEY REINER: Those are all my questions, Your Honor. Cross.

     THE COURT: You're saying the Rule 600 waiver was on August 9th, is that correct?

     THE DEFENDANT: The oral one was. The official colloquy --

     THE COURT: Again, I 'm talking to your attorney.

     ATTORNEY REINER: It was addressed on the record at that time, and then it was scheduled for another pre-trial conference. It was Attorney Dubbs for the Commonwealth and Attorney Blocher, and then they requested it to be scheduled for a Bench Trial, and the motion was withdrawn on the record.

     THE COURT: On August 9th?

     ATTORNEY REINER: Correct, August 9th, 2010, but Mr. Maitland's correct, that he wasn't – he didn't speak at that time.

     THE COURT: All right .

(Doc. 13-5, pp. 22-25). No questions on this issue were posed to Maitland on cross

examination.

Attorney Blocher also testified on the issue:

Q. Can you state your name for the record.

A. Bruce Blocher.

Q. And how are you currently employed?

A. With the County of York, the Public Defender's Office.-

Q. And how long have you been practicing as an attorney?

A. Twenty-nine years plus .

Q. And are you familiar with Nigel Maitland?

A. Yes, I am.

Q. And how did you become familiar with him?

A. I assigned myself to his case in May of 2009.

Q. And during the course of your involvement with him, at some point did you come to file a Rule 600 claim?

A. Yes, I did.

Q. And when did you file that claim?

A. When did I file it?  It was August 2nd, 2010 .

Q. And was a hearing held on that claim?

A. On that motion? No.

Q. What happened in regards to that motion?

A. What happened is, there was discussions -- a series of District Attorneys were involved in this case, Chuck Patterson who became Judge Patterson, then Scott McCabe, and then Seamus Dubbs, and there was a discussion with Seamus Dubbs concerning the fact that, first of all, I didn't include in there the time frames after each of the motions I filed that would have taken it to the next trial term, and also there were discussions with the Commonwealth about resolving this case, and according to Seamus Dubbs, I remember the conversation -- there were conversations with Scott McCabe that we were not prepared to go to trial.  Richard Robinson was involved in the mitigation side of this, the death penalty side of this case, and I'm not sure the status of his progress in the case at that time. So that -- so we had these discussions

33

and I took that back to Mr. Maitland. At some point there was an offer to withdraw the death penalty.

THE COURT: I'm sorry. Excuse me, are you saying in your motion you did not include time after previous motions were filed?

THE WITNESS: Simply the time between the motion filed and the resolution of the motion, but not anything after that, like to the next trial term. That was not included in my time table. In addition, there were these discussions I did have with the Commonwealth trying to -- beginning December, actually, of 2009, of bringing this case to a resolution and trying to, again, trying to avoid the death penalty in the case.

BY ATTORNEY ZAMKOTOWICZ :

Q. And did you believe that at that time you were going to win the 600 motion before Judge Kelley?

A. I couldn't guarantee a victory. I mean I would have. If Mr. Maitland wanted me to continue to pursue it, I would have. I told him I was unaware of a death penalty case being dismissed under Rule 600. I'm fairly certain I did tell him that. Did I scare him or did I force him or did I threaten him? Did I mislead him in any way? No, that did not happen. What I did is, I brought to him the offer by Attorney Dubbs that they would withdraw the death penalty and that we would go to a non-Jury Trial. Obviously it didn't go to a non- Jury Trial, and they still kept their word on the death penalty.

ATTORNEY ZAMKOTOWICZ: No additional questions, Your Honor.

CROSS EXAMINATION

BY ATTORNEY REINER:

Q. Attorney Blocher, so you filed the Rule 600 motion thinking that it was at least of arguable merit?

A. Obviously because the 365 days had gone by, and the time between my -- and the reason I filed it then, I believe Attorney Dubbs was going to call it in for a status hearing. I think that's what happened there. I think that's what motivated filing the petition, because we had not been before the Court for some time on this case.

Q. And was the Commonwealth's offer to withdraw the death penalty, was that a result of you filing the Rule 600 motion?

A. I believe so, I mean because they're always adamant about the death penalty. Attorney Patterson certainly was during his time involved in the case. And we were in negotiations about getting the death penalty to a plea, but that was always an issue. They were not just going to withdraw the death penalty. That was part -- part of the deal was that the Rule 600 had to go, and Mr. Maitland made that decision.

Q. Okay. So you felt that -- sorry, go ahead.

A. No, just that, that he made the decision. I didn't force that on him. I mean if he had said I want you to pursue this motion, you know, I don't care if the death penalty stays in, I would have moved forward with it .

Q. Okay. But you -- I guess you would have felt that at least -- that the Commonwealth was at least nervous about your motion and possibly losing it, and that's why they were offering to take the death penalty off?

A. I don't know if they were nervous or not, but they did make the offer, so you can draw whatever conclusions you want from that.

Q. Okay. And then?

A. I mean obviously the motion is jurisdictional, so it could be raised at any time.

Q. And on August 9th when this was dealt with and the motion was withdrawn, Mr. Maitland had indicated that there wasn't any colloquy done with him.

A. You know, I'll defer to whatever the record says . I have no recollection of that hearing.

Q. Okay. And do you recall if there ever was anything done with him on the record about withdrawing the 600 motion?

A. With me as his Counsel? No, I don't recall.

ATTORNEY REINER: Court's indulgence.   All right. No further questions .

REDIRECT EXAMINATION

BY ATTORNEY ZAMKOTOWICZ :

Q. The issue at the Rule 600 hearing, would that have involved the question of due diligence of the Commonwealth?

A. Correct. Well, I raised both the 600 and the 6th Amendment; although I've read cases where they've gone on for years and they didn't find that, at least from Supreme Court decisions, that it wasn't a violation of the speedy trial rule, so -- but we've always been taught as Defense Counsel to include both state and federal issues, and in fact I think it's an error not to do so.

Q. And earlier you said it had originally been Attorney Patterson. Was he elected during the course of while this case was pending?

A. Yes .

Q. And of course once he was elected judge, he could no longer continue the case, correct?

A. Correct. And for a period of time I think I dealt with Attorney Rebert in December of 2009, and I think it was in the years when Scott McCabe, who was still in the District Attorney's Office, became involved in the case.

Q. And do you recall why Attorney McCabe's involvement ended?

A. Why he became involved? I mean he became involved because Judge Patterson took the bench, and then there were long-term negotiations that really went on from probably, like I said, December through March, when I presented an offer to Mr. Maitland.

THE COURT: Was there a deadline connected to that offer?

THE WITNESS: Your Honor, to be honest, I don't recall. It took a while -- I think that was what the Commonwealth was saying to me, as, you know we gave you all this time to present this to your client, so, you know, we didn't call this in thinking this might be resolved. I think that's going to be one of their arguments, and that's why I told Mr. Maitland, I don't remember a specific date. I remember I presented it to him in March, because I actually typed up when it occurred between myself and Mr. Maitland and what the offer was.

ATTORNEY ZAMKOTOWICZ : I have no additional questions for Attorney Blocher, Your Honor.

RECROSS EXAMINATION

BY ATTORNEY REINER:

Q. Other than Attorney Patterson, District Attorney Rebert, Attorney McCabe, Attorney Eyster, were there any other attorneys that -- I know you didn't deal with Attorney Eyster, but was there any other one, any other attorneys from the Commonwealth that were?

A. Yes, Attorney Dubbs . He's the one that was involved in the, I think the death penalty being withdrawn.

(Doc. 13-5, pp. 31-39).

Attorney Spadafora testified as follows on the issue:

Q. You had indicated that when you first took over the case, there was still an issue. I don't know if it was pending before the Court or if it was something you discussed with your client regarding the 600 motion. Can you just state what your understanding was of Mr. Maitland's intentions with that motion?

A. Yeah. This was right at the time, and if I recall it correctly in the first hearing or the first time in front of the Judge on this case was to address this motion when I entered my representation. Bruce Blocher filed the motion based off of Rule 600. At that time the charges against him were first-degree murder, and they were going to seek the death penalty. The Commonwealth -- and most of this agreement was already reached before I jumped in between Bruce and myself. I just kind of argued it or agreed to it, that the Commonwealth would take the first -- or, the death penalty off if they would withdraw the motion.

Q. Okay. And you indicated that you had discussed that with Mr. Maitland?

A. That's correct.

Q. Do you recall where you had that conversation?

A. We had it both in prison and both in the courthouse.

Q. Okay. So if he indicated to the Court here in the process of this PCRA hearing that he didn't wish to withdraw the 600 motion, you're disagreeing with that now; is that correct?

A. I remember specifically when they came up with the deal to take off the death penalty, he was extremely happy. There was no question in his mind. He was, like, yeah, do it.

(Doc. 13-6, pp. 16-17).

In considering the issue on appeal, the Superior Court Superior Court opined as follows:

Maitland claims that his counsel threatened and bullied [him] into withdrawing the motion despite the fact that it had merit. Maitland's Brief at 20. At the PCRA hearing, both Attorney Blocher and Attorney Spadafora testified that when discussing this issue with Maitland, Maitland veritably jumped at the chance to have the death penalty taken off the table and eagerly agreed to withdraw the Rule 600 motion in exchange for the Commonwealth's agreement not to seek the death penalty. N. T.,6/ 25/ 14, at 33- 34; N. T., 7/ 14/ 14, at 6. Although Maitland testified to the contrary, *see* N. T., 6/ 25/ 14, at 23, the PCRA court found Attorneys Blocher and Spadafora credible and concluded that there was a reasonable basis for the withdrawal of the Rule 600 motion. PCRA Court Opinion, 2/ 3/ 15, at 6.

Maitland disagrees with the PCRA court's determination that Attorneys Blocher and Spadafora were credible. Maitland's Brief at 24 (The PCRA court erred in assessing credibility in favor of [Maitland's] counsel[.]"). As an - appellate court, we may not disturb the lower court's credibility determinations. Commonwealth v. Paxton, 821 A. 2d 594, 597 ( Pa. Super. 2003) ("It is not the role of an appellate court ... to pass on the credibility of witnesses or to act as the trier of fact, and an appellate court will not substitute its judgment for that of the fact-finder."). Based upon this credibility determination, which we are bound to accept, we find no error in the PCRA court's conclusion that Maitland failed to prove that there was no reasonable basis for trial counsel's withdrawal of the Rule 600 motion. Accordingly, Maitland's claim fails.

(Doc. 13-4, pp. 6, 7).

Maitland argues that the Commonwealth's sole reliance on the testimony of Attorney Spadafora is in error. (Doc. 19, p. 2). He argues that Attorney Spadafora did not and could not participate in the conversations or attend a hearing withdrawing his Rule 600 motion in exchange for taking the death penalty off the table because he did not represent him at the time. He indicates that his Rule 600 motion was filed on August 2, 2010, and withdrawn on August 9, 2010, and that Attorney Spadafora was not hired until August 27, 2010. He states that "[b]ecause Vincent Spadafora was coached to tell the same story as Bruce P. Blocher so it can be believed by the trial court. And even though he is an attorney he gave perjured testimony knowingly." (Id.). Maitland's PCRA testimony indicates otherwise. He testified that he discussed the Rule 600 motion with Attorney Spadafora. He also testified that Attorney Spadafora represented him during a colloquy hearing on the subject and that he did not testify at the hearing. Rather, Attorney Spadafora orally "waived" the Rule 600 motion. (Doc. 13-5, pp. 22-25).

"The federal habeas statute provides us 'no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by [us].' " Weeks v. Snyder, 219 F.3d 245, 258 (3d Cir. 2000) (quoting Marshall v. Lonberger, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983)). Given counsels' credited testimony at the PCRA hearing concerning the discussions with Maitland about the agreement to withdraw the Rule 600 motion in exchange for the Commonwealth not seeking the death penalty, and the absence of any evidence to the contrary, the Superior

Court's reliance on the PCRA court's finding that Maitland failed to prove that there was no reasonable basis for trial counsel's withdrawal of the Rule 600 motion, was not "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." See § 2254(d)(2). Nor was it contrary to, or an unreasonable application of Strickland. Maitland is not entitled to relief on this claim.

    2.    <u>Ground 3</u>

In Ground 3, Maitland contends that he was denied ineffective assistance of counsel when trial counsel failed to timely object during closing arguments to the prosecutor's misrepresentation of the testimony of the Commonwealth's expert witness on gangs, Mr. Keiser. (Doc. 1, p. 8; Doc. 19, p. 10). He argues the prosecutor indicated that "Mr. Keiser testified that the defendant was in a gang. See T.T. pg. 788. When in fact the only evidence permitted and testified to was that while the evidence points in that direction Mr. Keiser could not conclude for a fact that the defendant was part of the parkway gang." (Doc. 19, p. 10). The record reveals that during closing argument, the district attorney stated that the shooting was caused by "two rival gangs"; that other people involved were members of the Parkway gang; that the event that precipitated the shooting (a bar fight) "started because of gang rivalry"; and characterized the recipient of a letter that Maitland wrote while in jail as "another Parkway member." (Doc. 13-4, p. n 2 quoting N.T., 3/9/11 Vol. II, at 788-89). It is his position that trial counsel should have "immediately objected to the closing argument so as to prevent the jury from being

further polluted by the prosecution's misrepresentation of the testimony of the expert witness. Instead, Mr. Spadafora waited until the conclusion of the closing argument to object. See T.T. pg. 804-805. All though [sic] defense counsel did object, his objection was untimely and allowed the jury to be polluted by the prosecution's misrepresentation of the facts." (Doc. 19, p. 10).

The issue was addressed during the PCRA proceedings. Attorney Spadafora offered the following testimony on this issue at the PCRA hearing:

> Q. Now, the DA's Office had questioned you about Dustin Keiser and his testimony at trial regarding the gang affiliation, and what he was referring to was the objection that came at the end of closing arguments. And you did, in fact, make an objection to the prosecutor's statement, but I guess you're indicating now you don't recall that; correct?
>
> A. I don't, no.
>
> Q. Okay. If I would read that portion of the transcript to you, would that possibly refresh your recollection?
>
> A. It could, yeah. I mean, we're talking a couple years. It would be helpful.
>
> Q. Okay. And this is at the conclusion of closing arguments. You had asked to approach sidebar, and the discussion was held. You had said, Your Honor, as far as when the closings started, I didn't object during closings. She, referring to Attorney Eyster, stated, My expert said they were part of a gang. And you said, My understanding of your order said they could be linked to it, but not, in fact, a conclusion they were part of the gang, so I'm objecting to that part of the testimony and ask the jury to be instructed accordingly. Do you recall that?
>
> A. Honestly, I still don't recall it. If I did it at the end of closing and not during the closing, if I sat here and heard that same testimony again, I would not object during closing arguments because I think it is something they can use based off the testimony that was given.

41

My guess is, and I have to guess because I don't remember making that argument, and the fact I made it at the end of closing is that my client obviously wanted me to, and then I made the argument that I should have, and at that time I approached and made the argument.

But if I heard that same testimony in closing, I don't think it's an objectionable issue. If your client wants it done, they want it done.

Q. And just as a final question on that, on that issue, do you recall whether the Court did, in fact, give any kind of curative instruction in closing instructions regarding the prosecutor's statement in her closing?

A. Again, I don't recall that specific.

(Doc. 13-6, pp. 17-19).

The PCRA determined that the statements made by the prosecutor were not objectionable and concluded that Maitland failed to establish that the first prong of the ineffectiveness test, that the underlying claim had arguable merit. (Doc. 13-4, pp. 3, 4). In agreeing with the PCRA court's conclusion, the Superior Court found as follows:

> "[A] prosecutor has considerable latitude during closing arguments and his or her statements are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence." *Commonwealth v. Noel*, 53 A. 3d 848, 858 ( Pa. Super. 2012), aff'd, 104 A. 3d 1156 ( Pa. 2014). The Commonwealth's expert in gangs and gang violence was shown a picture of Maitland's tattoo, which says "P- Way." He testified that based on his training and experience, it was "an indication that th[e] individual is involved with the Parkway gang." N. T:, 3/ 9/ 11 Vol II, at 603- 04. The complained-of statements, that Maitland was in a gang or affiliated with gang members, were therefore based on inferences that were reasonably drawn from this evidence. The statements were not objectionable, and therefore, Attorney Spadafora was not ineffective for failing to object to them.

(Doc. 13-4, p. 5). Because "counsel cannot be deemed ineffective for failing to raise a meritless claim," the Superior Court's determination that Maitland was not entitled to

relief on the ineffective assistance of counsel claim was neither contrary to, nor an

unreasonable application of <u>Strickland</u>. <u>See</u> <u>Werts</u>, 228 F.3d at 203.[2]  Nor was it an "an

unreasonable determination of the facts in light of the evidence presented in the state

court proceeding." <u>See</u> § 2254(d)(2).

## IV.  <u>Certificate of Appealability</u>

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a

certificate of appealability ("COA"), an appeal may not be taken from a final order in a

---

[2] Notably, as Mailtand concedes, at the conclusion of closing arguments, Attorney Spadafora sought a side bar concerning the prosecutor's remarks about gang affiliation.  (Doc. 19, p. 10).  The following exchange took place:

> ATTORNEY SPADAFORA:  Your Honor, as far as when the closings started, I didn't object during closings.  She stated my expert said they were part of a gang.
> My understanding of your order said they could be linked to it, but not, in fact, a conclusion they were part of the gang, so I am objecting to that accordingly.
>
> THE COURT:  It is for the jury to determine what the expert said, number one.
> I'm not – I'm not as clear as to whether or not there was a direct indication in her closing argument that they were part of a gang.  I'm going to be giving a clear instruction that being a part of a gang or in association is not proof of any guilt, so I will be covering that.
>
> ATTORNEY SPADAFORA:  Understand.

(Doc. 13-11, pp. 139, 140).  The trial court instructed the jury as follows:

> Also, I have to note for you, that another important principle is one that is founded on our United States Constitution.  You may not base a decision predicated on guilt by association.  That kind of thinking would violate both the Fifth and the First Amendment to our constitution.  Determination of guilt must be personal and must be that which is tailored to the charges that the individual is proven to be guilty beyond a reasonable doubt.  To draw an analogy, just because someone is – is or may be shown to have affiliation with X club, X group, whatever the case may be, that is not the end product that leads to the conclusion of guilt.  It is for the Commonwealth to establish that personal guilt.

(Doc. 13-11, p. 149).

proceeding under 28 U.S.C. § 2254. A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322 (2003). Maitland fails to demonstrate that a COA should issue.

The denial of a certificate of appealability does not prevent Maitland from appealing the order denying his petition so long as he seeks, and obtains, a certificate of appealability from the Third Circuit Court of Appeals. See FED. R. APP. P. 22(b)(1).

## V.    Conclusion

For the reasons set forth above, the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 will be denied.

A separate Order will enter.

**BY THE COURT:**

**s/James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**

**Dated:**        September 4, 2019